Alex J. De Castroverde
Nevada Bar No. 6950
Ryan Samano
Nevada Bar No. 15995
**DE CASTROVERDE LAW GROUP**
1149 S. Maryland Pkwy
Las Vegas, NV 89104
Tel: 702.222.9999
Fax: 702.383.8741
Ryan@dlgteam.com
-and-
Leigh S. Montgomery* (Texas Bar No. 24052214)
**EKSM, LLP**
1105 Milford Street
Houston, Texas 77006
Telephone: (888) 350-3931
lmontgomery@eksm.com
**ATTORNEYS FOR PLAINTIFF AND THE PUTATIVE CLASS**
(* denotes *pro hac vice* forthcoming)

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| **SHANETT NOBLE**, individually and on behalf of all others similarly situated,<br><br>*Plaintiff*,<br><br>v.<br><br>**ABSOLUTE DENTAL GROUP, LLC**,<br><br>*Defendant*. | CASE NO.:<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY DEMAND** |

### PLAINTIFF'S CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff Shanett Noble ("Plaintiff"), individually and on behalf of all others similarly situated, brings this Class Action Complaint ("Complaint") against Defendant, Absolute Dental Group, LLC, ("Absolute Dental" or "Defendant"), to obtain damages, restitution, and injunctive relief for the Class,

as defined below, from Defendant. Plaintiff makes the following allegations upon information and belief, except as to her own actions, the investigation of her counsel, and the facts that are a matter of public record.

## I.    INTRODUCTION

1.      This class action arises out of Defendant's recent data security incident that occurred on or around the date(s) of February 19, 2025 through March 5, 2025, which resulted in the breach of Defendant's computer network systems (the "Data Breach") and the disclosure of Defendant's current and former patients' (collectively, "the putative class members" or "Class Members") personally identifiable information ("PII") and protected health information ("PHI") (collectively, the "Private Information") which was possessed by Defendant on the Defendant's computer network systems.

2.      Defendant Absolute Dental is a Nevada limited liability company.[1]

3.      Defendant operates as a dental service in Las Vegas, Reno, Carson City, Henderson, Minden and Sparks, Nevada.[2] Defendant is a full-service dental care provider performing general dental care, oral surgery, and other specialized services.[3]

4.      In the ordinary course of business, all current and/or former patients are encouraged and/or are obligated to provide the Defendant with their Private Information to obtain dental care services, with the understanding that Defendant would reasonably protect the Private Information.

5.      Plaintiff is one of the Defendant's current/former patients who provided Defendant with her Private Information.

6.      Defendant obtained, collected and maintained the Plaintiff's and Class Members' Private Information on Defendant's computer network systems, which lacked the adequate and reasonable cyber-security procedures and protocols, leaving the Plaintiff's and Class Members' Private Information entrusted to Defendant unprotected from the risk of improper disclosure.

7.      The Private Information included but is not limited to the Plaintiff's and Class

---

[1] SilverFlume, Nevada's business Portal --available at: https://esos.nv.gov/EntitySearch/BusinessInformation (last visited September 4, 2025).
[2] Absolutedental.com  –  available  at:  https://www.absolutedental.com/all-dentists-at-absolute-dental/  (last  visited September 4, 2025).
[3] *Id*.

Member's "name, contact information, Social Security number, date of birth, and health information." *See* Notice of Data Breach, attached hereto as Exhibit A.

8. On August 26, 2025, Defendant informed the Oregon Department of Justice that 1,223,635 individuals' Private Information was compromised in the Data Breach.[4]

9. The Data Breach resulted from vulnerabilities in Defendant's computer network system which Defendant created by its failure to implement adequate and reasonable cyber-security procedures and protocols to protect Defendant's computer network systems.

10. Upon information and belief, cyber-criminals exploited the vulnerabilities in Defendant's computer network, accessed, encrypted, and stole the Private Information held on Defendant's computer network systems which included the Plaintiff's and Class Members' Private Information.

11. Upon information and belief, Defendant was on notice that failure to implement adequate and reasonable cyber-security procedures and protocols left the information held on Defendant's computer network systems in a dangerous condition and knew the risk of a data security incident occurring and leading to the improper disclosure of Plaintiff's and Class Members' Private Information.

12. The Private Information remains in the hands of the cyber-criminals who perpetrated the Data Breach and is likely to be disclosed on the dark web or to data brokers.

13. Plaintiff brings this class action lawsuit, on behalf of those similarly situated, to address Defendant's inadequate safeguarding of Class Members' Private Information and for failing to provide timely and adequate notice to Plaintiff and other Class Members informing Plaintiff and Class Members of the Data Breach and that the Private Information was subjected to unauthorized access by cyber-criminals and precisely what specific type of information was accessed.

14. Plaintiff's and Class Members' identities, physical safety, and financial stability are now at risk because of Defendant's negligent conduct since the Private Information that Defendant held on its computer network system is now possessed by cyber-criminals.

---

[4] Oregon Department of Justice, Consumer Protection, Search Data Breaches *available at* https://justice.oregon.gov/consumer/databreach/ (*last accessed* September 4, 2025).

15.    Plaintiff and Class Members may also incur out of pocket costs for, *e.g.*, purchasing credit monitoring services, credit freezes, credit reports, or other protective measures to deter and detect identity theft.

16.    Through this Complaint, Plaintiff seeks to remedy these harms on behalf of herself, and all similarly situated individuals whose Private Information was accessed, disclosed, encrypted or taken during the Data Breach.

17.    Plaintiff seeks remedies including, but not limited to, compensatory damages, reimbursement of out-of-pocket costs, and injunctive relief including improvements to Defendant's data security systems, future annual audits, and adequate credit monitoring services funded by Defendant.

18.    Accordingly, Plaintiff Noble sues Defendant seeking redress for its unlawful conduct and asserts claims for: (i) negligence, (ii) breach of implied contract, and (iii) unjust enrichment.

## II.    PARTIES

19.    Plaintiff Shanett Noble at all times mentioned herein is an individual citizen of Nevada, residing in the city of Las Vegas.

20.    Defendant Absolute Dental is a Nevada-based limited liability company with its headquarters and principal place of business at 8370 Cheynne Ave Ste 103, Las Vegas, NV 89129.[5]

21.    Defendant can be served through its registered agent, The Corporation Trust Company of Nevada at 701 S. Carson St. Ste 200, Carson City, NV 89701.[6]

## III.    JURISDICTION AND VENUE

22.    This Court has subject matter jurisdiction over this action under the Class Action Fairness Act ("CAFA") 28 U.S.C. § 1332(d) because the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs and a member of the class is a citizen of a State different from the Defendant.

23.    This court has personal jurisdiction over Defendant because Defendant conducts

---

[5] SilverFlume, Nevada's business Portal --available at: https://esos.nv.gov/EntitySearch/BusinessInformation (last visited September 4, 2025)
[6] *Id*.

1    business in this District, maintains its principal place of business in this District, and has sufficient

2    minimum contacts with this State.

3        24.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because Defendant's

4    principal place of business is in this District and therefore resides in this District and a substantial part

5    of the events or omissions giving rise to the Class's claims also occurred in this District.

**IV.    <u>FACTUAL ALLEGATIONS</u>**

6    

7    *DEFENDANT'S BUSINESS*

8        25.    Defendant Absolute Dental is a full service dental care provider performing general

9    dental care, oral surgery, and other specialized services.[7]

10        26.    Plaintiff and Class Members are current and former patients (collectively "patients")

11    of Defendant.

12        27.    In the ordinary course of business, Defendant's patients are encouraged and/or are

13    mandated to provide (and Plaintiff did provide) the Defendant with sensitive, personal, and private

14    information, such as his or her:

15            a.    name,

16            b.    contact information,

17            c.    Social Security number,

18            d.    date of birth, and

19            e.    health information.[8]

20        28.    On information and belief, Defendant stored this Private Information on its computer

21    network system located at its principal place of business in Nevada.

22        29.    As the custodian of the Plaintiff's and Class Members' Private Information, based on

23    the relationship between the Defendant and Defendant's patients, Defendant agreed to and undertook

24    certain legal duties to maintain the confidentiality of the Private Information entrusted to it and to

25    ensure that the Defendant's computer network system, containing the Private Information, is in

26    

27    ───────────────

28    [7]  Absolutedental.com, available at: https://www.absolutedental.com/all-dentists-at-absolute-dental/ (last visited September 4, 2025).
[8]  *See* Notice of Security Breach (Exhibit A).

**CLASS ACTION COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**
-- 5 --

1  compliance with all applicable laws, regulations and industry standards.

2  **THE DATA BREACH**

3     30.    Defendant negligently maintained its computer network system in a condition that

4  failed to meet the industry standards set by the FTC, industry guides, and information technology

5  security recommendations and manufacturers.

6     31.    On August 26, 2025, Absolute Dental confirmed it notified 1,223,635 people of a

7  February 19, 2025, through March 5, 2025 Data Breach that compromised their name, contact

8  information, Social Security number, date of birth, and health information, including but not limited

9  to, health history, treatment and diagnosis information, explanation of benefits, health insurance

10  information, and/or MRN number or patient identification number.[9]

11     32.    A Data Breach occurs when unauthorized cyber criminals access a computer network

12  system that has not been adequately and reasonably secured.

13     33.    On or about August 26, 2025, Defendant mailed Plaintiff a "Notice of Data Security

14  Incident"[10] that stated in part:

**What Happened?**

On February 26, 2025, we became aware of a potential issue involving absolute Dental's information systems. We immediately took steps to secure our systems and investigate the extent of this activity. We also retained third-;party forensic investigators to assist in our investigation of the event. With their help, we determined that an unauthorized party accessed some of our systems between February 19, 2025, and March 5, 2025. Based on their investigation, the unauthorized access appears to have originated from the inadvertent execution of a malicious version of a legitimate software tool, which occurred through an account associated with Absolute Dental's third-party managed services provider.

**What Information was Involved?**

As part of our investigation, we assessed what sensitive personal information may have been impacted in connection with the event. We concluded this assessment on July 28, 2025 and determined that the sensitive personal

---

[9] *Id.*
[10] *Id.*

information of certain individuals, including you, may have been affected. Such sensitive personal information may include your name, contact information, Social Security number, date of birth, and health information, which may include health history, treatment and diagnosis information, explanation of benefits, health insurance information, and/or MRN number or patient identification number.

34.    The U.S. Department of Health and Human Services requires, "[i]f a breach of unsecured protected health information affects 500 or more individuals, a covered entity must notify the Secretary of the breach without unreasonable delay and in no case later than 60 calendar days from the discovery of the breach."  Further, if "the number of individuals affected by a breach is uncertain at the time of submission, the covered entity should provide an estimate," and later provide an addendum or correction to HHS.

35.    Defendant cannot claim it was unaware of the HHS notification requirements as they complied (at least in part) with those requirements.

36.    Plaintiff's notice letters were dated nearly seven months after Defendant discovered the Data Breach.

37.    Within this notice, Defendant failed to state whether it was able to contain or end the cybersecurity threat, leaving victims in fear of their Private Information being leaked to the public or offered for sale to the public by data brokers and whether their Private Information that Absolute Dental continues to maintain is secure.

38.    All this information is vital to victims of a data breach due to the sensitivity, importance and value of the Private Information compromised in this specific breach.

39.    Defendant had obligations created by HIPAA, contract, industry standards, common law, and representations made to Class Members, to keep Class Members' Private Information confidential and to protect it from unauthorized access and disclosure.

40.    Plaintiff and Class Members provided Defendant with their Private Information reasonably expected and belief that Defendant had implied a promise and accepted the responsibility to keep such information confidential and secure from unauthorized access as part of their contract to do business together.

41.    Defendant acknowledges they are bound by national data security standards.[11]

42.    Defendant admits that their Consumer Privacy Notice is provided to all individual patients, for a comprehensive explanation of how Defendant collects, uses, and shares their personal information. [12]

43.    Defendant's data security obligations were particularly important given the substantial increase in Data Breaches in the healthcare industry preceding the date of the breach.

44.    In 2023, a record 3,205 data breaches occurred, resulting in around 353,027,892 individuals' information being compromised, a 78% increase from 2022.[13]

45.    Data breaches such as the one experienced by Defendant have become so notorious that the Federal Bureau of Investigation ("FBI") and U.S. Secret Service have issued a warning to potential targets, so they are aware of, and prepared for, a potential attack.

46.    Therefore, the increase in such attacks, and attendant risk of future attacks, was widely known to the public and to anyone in Defendant's industry, including Defendant.

*DATA BREACHES ARE PREVENTABLE*

47.    Defendant failed to use reasonable security procedures and practices appropriate to the nature of the sensitive information they were maintaining for Plaintiff and Class Members, causing the exposure of Private Information, such as encrypting the information or deleting it when it is no longer needed.

48.    Defendant could have prevented this Data Breach by, among other things, properly encrypting or otherwise protecting their equipment and computer files containing Private Information.

49.    As explained by the Federal Bureau of Investigation, "[p]revention is the most effective defense against ransomware and it is critical to take precautions for protection."[14]

50.    To prevent and detect cyber-attacks and/or ransomware attacks, Defendant could and



---

[11]https://www.absolutedental.com/wp-content/uploads/2023/08/Absolute-New-Patient-Packet-English-August-2023-Fillable.pdf

[12] https://www.absolutedental.com/privacy-policy/

[13]*See* Identity Theft Resource Center, *2023 Data Breach Report* (January 2024), *available at* https://www.idtheftcenter.org/publication/2023-data-breach-report/ (last visited September 4, 2025)

14 How to Protect Your Networks from RANSOMWARE, at 3, available at: https://www.fbi.gov/file-repository/ransomware-prevention-and-response-for-cisos.pdf/view (last visited September 4, 2025)

should have implemented, as recommended by the United States Government, the following measures:

- Implement an awareness and training program. Because end users are targets, employees and individuals should be aware of the threat of ransomware and how it is delivered.

- Enable strong spam filters to prevent phishing emails from reaching the end users and authenticate inbound email using technologies like Sender Policy Framework (SPF), Domain Message Authentication Reporting and Conformance (DMARC), and DomainKeys Identified Mail (DKIM) to prevent email spoofing.

- Scan all incoming and outgoing emails to detect threats and filter executable files from reaching end users.

- Configure firewalls to block access to known malicious IP addresses.

- Patch operating systems, software, and firmware on devices. Consider using a centralized patch management system.

- Set anti-virus and anti-malware programs to conduct regular scans automatically.

- Manage the use of privileged accounts based on the principle of least privilege: no users should be assigned administrative access unless absolutely needed; and those with a need for administrator accounts should only use them when necessary.

- Configure access controls—including file, directory, and network share permissions—with least privilege in mind. If a user only needs to read specific files, the user should not have write access to those files, directories, or shares.

- Disable macro scripts from office files transmitted via email. Consider using Office Viewer software to open Microsoft Office files transmitted via email instead of full office suite applications.

- Implement Software Restriction Policies (SRP) or other controls to prevent programs from executing from common ransomware locations, such as temporary folders supporting popular Internet browsers or compression/decompression programs, including the AppData/LocalAppData folder.

- Consider disabling Remote Desktop protocol (RDP) if it is not being used.

- Use application whitelisting, which only allows systems to execute programs known and permitted by security policy.

- Execute operating system environments or specific programs in a virtualized environment.

- Categorize data based on organizational value and implement physical and logical separation of networks and data for different organizational units.[15]

51.    To prevent and detect cyber-attacks or ransomware attacks, Defendant could and should have implemented, as recommended by the Microsoft Threat Protection Intelligence Team, the following measures:

**Secure Internet-Facing Assets**
- Apply latest security updates
- Use threat and vulnerability management
- Perform regular audit; remove privileged credentials;

**Thoroughly investigate and remediate alerts**
- Prioritize and treat commodity malware infections as potential full compromise;

**Include IT Pros in security discussions**
- Ensure collaboration among [security operations], [security admins], and [information technology] admins to configure servers and other endpoints securely;

**Build credential hygiene**
- Use [multifactor authentication] or [network level authentication] and use strong, randomized, just-in-time local admin passwords;

**Apply principle of least-privilege**
- Monitor for adversarial activities
- Hunt for brute force attempts
- Monitor for cleanup of Event Logs
- Analyze logon events;

**Harden infrastructure**
- Use Windows Defender Firewall
- Enable tamper protection
- Enable cloud-delivered protection
- Turn on attack surface reduction rules and [Antimalware Scan Interface] for Office[Visual Basic for Applications].[16]

52.    Given that Defendant was storing the Private Information of its current and former

---

[15] *Id.* at 3-4.
[16] *See* Human-operated ransomware attacks: A preventable disaster (Mar 5, 2020), *available at:* https://www.microsoft.com/security/blog/2020/03/05/human-operated-ransomware-attacks-a-preventable-disaster/ (last viewed September 4, 2025).

1    patients Defendant could and should have implemented all the above measures to prevent and detect

2    cyberattacks.

3    53.    The occurrence of the Data Breach indicates that Defendant failed to adequately

4    implement one or more of the above measures to prevent cyberattacks, resulting in the Data Breach

5    and data thieves acquiring and accessing the Private Information of, upon information and belief,

6    thousands to tens of thousands of individuals, including that of Plaintiff and Class Members.

7    *DEFENDANT ACQUIRES, COLLECTS & STORES PATIENTS' PRIVATE INFORMATION*

8    54.    Defendant acquires, collects, and stores a massive amount of Private Information on

9    its current and former patients.

10    55.    As a condition of becoming a patient of Defendant, Defendant requires all patients to

11    entrust it with highly sensitive personal information and protected health information.

12    56.    By obtaining, collecting, and using Plaintiff's and Class Members' Private

13    Information, Defendant assumed legal and equitable duties and knew or should have known that it

14    was responsible for protecting Plaintiff's and Class Members' Private Information from disclosure.

15    57.    Plaintiff and the Class Members have taken reasonable steps to maintain the

16    confidentiality of their Private Information and would not have entrusted it to Defendant absent a

17    promise to safeguard that information.

18    58.    Upon information and belief, while collecting Private Information from patients,

19    including Plaintiff, Defendant promised to provide confidentiality and adequate security for their data

20    through its applicable privacy policy and through other disclosures in compliance with statutory

21    privacy requirements.

22    59.    Plaintiff and the Class Members relied on Defendant to keep their Private Information

23    confidential and securely maintained, to use this information for business purposes only, and to make

24    only authorized disclosures of this information.

25    *VALUE OF PRIVATE INFORMATION*

26    60.    The Federal Trade Commission ("FTC") defines identity theft as "a fraud committed

27

28

or attempted using the identifying information of another person without authority."[17]The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number."[18]

61. The PII of individuals remains of high value to criminals, as evidenced by the prices they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity credentials.[19] For example, Personal Information can be sold at a price ranging from $40 to $200.[20] Criminals can also purchase access to entire company data breaches from $900 to $4,500.[21]

62. Theft of PHI is gravely serious: "[a] thief may use your name or health insurance numbers to see a doctor, get prescription drugs, file claims with your insurance provider, or get other care. If the thief's health information is mixed with yours, your treatment, insurance and payment records, and credit report may be affected."[22] Among other forms of fraud, identity thieves may obtain driver's licenses, government benefits, medical services, and housing or even give false information to police.

63. The fraudulent activity resulting from the Data Breach may not come to light for years. There may be a time lag between when harm occurs versus when it is discovered, and also between when Private Information is stolen and when it is used. According to the U.S. Government Accountability Office ("GAO"), which conducted a study regarding data breaches:

---

[17] 17 C.F.R. § 248.201 (2013).
[18] *Id.*
[19] *Your personal data is for sale on the dark web. Here's how much it costs,* Digital Trends, Oct. 16, 2019, *available at*: https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/ (last viewed September 4, 2025).
[20] *Here's How Much Your Personal Information Is Selling for on the Dark Web*, Experian, Dec. 6, 2017, *available at*: https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/ (last viewed September 4, 2025).
[21] *In the Dark*, VPNOverview, 2019, *available at*: https://vpnoverview.com/privacy/anonymous-browsing/in-the-dark/ (last viewed September 4, 2025).
[22] Medical I.D. Theft, EFraudPrevention, avaialable at https://efraudprevention.net/home/education/?a=187#:~:text=A%20thief%20may%20use%20your,credit%20report%20may%20be%20affected. (last visited September 4, 2025).

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[23]

64.     Plaintiff and Class Members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. The Class is incurring and will continue to incur such damages in addition to any fraudulent use of their Private Information.

### DEFENDANT FAILS TO COMPLY WITH FTC GUIDELINES

65.     The Federal Trade Commission ("FTC") has promulgated many guides for businesses which show how important it is to implement reasonable data security practices. According to the FTC, the need for data security should shape all business decision-making.

66.     In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established cyber-security guidelines for businesses. The guidelines note that businesses should protect the personal Private Information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems.[24]

67.     The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor incoming traffic for activity suggesting someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.[25]

68.     The FTC further recommends that companies not maintain PII/PHI longer than is

---

[23] *Report to Congressional Requesters, GAO, at 29 (June 2007), available at: https://www.gao.gov/assets/gao-07-737.pdf (last visited* September 4, 2025).
[24] Federal Trade Commission, *Protecting Personal Information: A Guide for Business* (2016), *available at* www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf (last visited September 4, 2025).
[25] *Id*.

1  needed for authorization of a transaction; limit access to sensitive data; require complex passwords

2  to be used on networks; use industry-tested methods for security; monitor for suspicious activity on

3  the network; and verify that third-party service providers have implemented reasonable security

4  measures.

5       69.     The FTC has brought enforcement actions against businesses for failing to adequately

6  and reasonably protect the Private Information in their possession by treating the failure to employ

7  reasonable and appropriate measures to protect against unauthorized access to confidential consumer

8  data as an *unfair act or practice* prohibited by Section 5 of the Federal Trade Commission Act

9  ("FTCA"), 15 U.S.C. § 45.[emphasis added].

10      70.     Orders resulting from these actions also clarify the measures businesses must take to

11  meet their data security obligations.

12      71.     These FTC enforcement actions include actions against healthcare providers like

13  Defendant. *See, e.g., In the Matter of LabMD, Inc., A Corp*, 2016-2 Trade Cas. (CCH) ¶ 79708, 2016

14  WL 4128215, at *32 (MSNET July 28, 2016) ("[T]he Commission concludes that LabMD's data

15  security practices were unreasonable and constitute an unfair act or practice in violation of Section 5

16  of the FTC Act.").

17      72.     Defendant failed to properly implement basic data security practices.

18      73.     Defendant's failure to employ reasonable and appropriate measures to protect against

19  unauthorized access to patients' PII and PHI constitutes an unfair act or practice prohibited by Section

20  5 of the FTC Act, 15 U.S.C. § 45.

21      74.     Defendant was always fully aware of its obligation to protect the PII and PHI of its

22  patients. Defendant was also aware of the significant repercussions that would result from its failure

23  to do so.

24  ***Defendant Failed to Comply with HIPAA Guidelines***

25      75.  Defendant is a covered entity under HIPAA (45 C.F.R. § 160.102) and is required to

26  comply with the HIPAA Privacy Rule and Security Rule, 45 C.F.R. Part 160 and Part 164, Subparts

27  A and E ("Standards for Privacy of Individually Identifiable Health Information"), and Security Rule

28  ("Security Standards for the Protection of Electronic Protected Health Information"), 45 C.F.R. Part

160 and Part 164, Subparts A and C.

76.   Defendant is subject to the rules and regulations for safeguarding electronic forms of medical information pursuant to the Health Information Technology Act ("HITECH").[26] *See* 42 U.S.C. §17921, 45 C.F.R. § 160.103.

77.   HIPAA's Privacy Rule or *Standards for Privacy of Individually Identifiable Health Information* establishes national standards for the protection of health information.

78.   HIPAA's Privacy Rule or *Security Standards for the Protection of Electronic Protected Health Information* establishes a national set of security standards for protecting health information that is kept or transferred in electronic form.

79.   HIPAA requires "compl[iance] with the applicable standards, implementation specifications, and requirements" of HIPAA "with respect to electronic protected health information." 45 C.F.R. § 164.302.

80.   "Electronic protected health information" is "individually identifiable health information … that is (i) transmitted by electronic media; maintained in electronic media." 45 C.F.R. § 160.103.

81.   HIPAA's Security Rule requires Defendant to do the following:

a. Ensure the confidentiality, integrity, and availability of all electronic protected health information the covered entity or business associate creates, receives, maintains, or transmits;

b. Protect against any reasonably anticipated threats or hazards to the security or integrity of such information;

c. Protect against any reasonably anticipated uses or disclosures of such information that are not permitted; and

d. Ensure compliance by its workforce.

82.   HIPAA also requires Defendant to "review and modify the security measures implemented … as needed to continue provision of reasonable and appropriate protection of

---

[26] HIPAA and HITECH work in tandem to provide guidelines and rules for maintaining protected health information. HITECH references and incorporates HIPAA.

electronic protected health information." 45 C.F.R. § 164.306(e). Additionally, Defendant is required under HIPAA to "[i]mplement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights." 45 C.F.R. § 164.312(a)(1).

83.     HIPAA and HITECH also obligated Defendant to implement policies and procedures to prevent, detect, contain, and correct security violations, and to protect against uses or disclosures of electronic protected health information that are reasonably anticipated but not permitted by the privacy rules. *See* 45 C.F.R. § 164.306(a)(1) and § 164.306(a)(3); *see also* 42 U.S.C. §17902.

84.     The HIPAA Breach Notification Rule, 45 C.F.R. §§ 164.400-414, also requires Defendant to provide notice of the Data Breach to each affected individual "without unreasonable delay and *in no case later than 60 days following discovery of the breach*."[27]

85.     HIPAA requires a covered entity to have and apply appropriate sanctions against patients of its workforce who fail to comply with the privacy policies and procedures of the covered entity or the requirements of 45 C.F.R. Part 164, Subparts D or E. *See* 45 C.F.R. § 164.530(e).

86.     HIPAA requires a covered entity to mitigate, to the extent practicable, any harmful effect that is known to the covered entity of a use or disclosure of protected health information in violation of its policies and procedures or the requirements of 45 C.F.R. Part 164, Subpart E by the covered entity or its business associate. *See* 45 C.F.R. § 164.530(f).

87.     HIPAA also requires the Office of Civil Rights ("OCR"), within the Department of Health and Human Services ("HHS"), to issue annual guidance documents on the provisions in the HIPAA Security Rule. *See* 45 C.F.R. §§ 164.302-164.318. For example, "HHS has developed guidance and tools to assist HIPAA covered entities in identifying and implementing the most cost effective and appropriate administrative, physical, and technical safeguards to protect the confidentiality, integrity, and availability of e- and comply with the risk analysis requirements of the Security Rule." US Department of Health & Human Services, Security Rule Guidance Material.[28]

---

[27] Breach Notification Rule, U.S. Dep't of Health & Human Services, https://www.hhs.gov/hipaa/for-professionals/breach-notification/index.html (emphasis added).
[28] http://www.hhs.gov/hipaa/for-professionals/security/guidance/index.html.

1    The list of resources includes a link to guidelines set by the National Institute of Standards and

2    Technology (NIST), which OCR says, "represent the industry standard for good business practices

3    with respect to standards for securing e-." US Department of Health & Human Services, Guidance on

4    Risk Analysis.[29]

5        *DEFENDANT FAILS TO COMPLY WITH INDUSTRY STANDARDS*

6        88.    As shown above, experts studying cyber security routinely identify healthcare

7    providers as being particularly vulnerable to cyberattacks because of the value of the PII and PHI

8    which they collect and maintain.

9        89.    Several best practices have been identified that a minimum should be implemented by

10   healthcare providers like Defendant, including, but not limited to, educating all employees; using

11   strong passwords; creating multi-layer security, including firewalls, antivirus, and anti-malware

12   software; encryption, making data unreadable without a key; using multi-factor authentication;

13   protecting backup data; and limiting which employees can access sensitive data.

14       90.    Other best cybersecurity practices that are standard in the healthcare industry include

15   installing appropriate malware detection software; monitoring and limiting the network ports;

16   protecting web browsers and email management systems; setting up network systems such as

17   firewalls, switches and routers; monitoring and protection of physical security systems; protection

18   against any possible communication system; training staff regarding critical points.

19       91.    Defendant failed to meet the minimum standards of any of the following frameworks:

20   the NIST Cybersecurity Framework Version 2.0 (including, without limitation, PR.AA-01, PR.AA.-

21   02, PR.AA-03, PR.AA-04, PR.AA-05, PR.AT-01, PR.DS-01, PR-DS-02, PR.DS-10, PR.PS-01,

22   PR.PS-02, PR.PS-05, PR.IR-01, DE.CM-01, DE.CM-03, DE.CM-06, DE.CM-09, and RS.CO-04),

23   and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established

24   standards in reasonable cybersecurity readiness.

25       92.    These foregoing frameworks are existing and applicable industry standards in the

26   healthcare industry, and Defendant failed to comply with these accepted standards, thereby opening

27

28   _____

[29] https://www.hhs.gov/hipaa/for-professionals/security/guidance/guidance-risk-analysis/index.html

the door to and causing the Data Breach.

## V. DEFENDANT'S BREACH

93.     Defendant breached its obligations to Plaintiff and Class Members and/or was otherwise negligent and reckless because it failed to properly maintain and safeguard its computer systems and its data. Defendant's unlawful conduct includes, but is not limited to, the following acts and/or omissions:

a.     Failing to maintain an adequate data security system to reduce the risk of data breaches and cyber-attacks;

b.     Failing to adequately protect patients' Private Information;

c.     Failing to properly monitor its own data security systems for existing intrusions;

d.     Failing to ensure that vendors with access to Defendant's protected health data employed reasonable security procedures;

e.     Failing to ensure the confidentiality and integrity of electronic PHI they created, received, maintained, and/or transmitted, in violation of 45 C.F.R. § 164.306(a)(1);

f.     Failing to implement technical policies and procedures for electronic information systems that maintain electronic PHI to allow access only to those persons or software programs that have been granted access rights in violation of 45 C.F.R. § 164.312(a)(1);

g.     Failing to implement policies and procedures to prevent, detect, contain, and correct security violations in violation of 45 C.F.R. § 164.308(a)(1)(i);

h.     Failing to implement procedures to review records of information system activity regularly, such as audit logs, access reports, and security incident tracking reports in violation of 45 C.F.R. § 164.308(a)(1)(ii)(D);

i.     Failing to protect against reasonably anticipated threats or hazards to the security or integrity of electronic PHI in violation of 45 C.F.R. § 164.306(a)(2);

j.     Failing to protect against reasonably anticipated uses or disclosures of electronic PHI that are not permitted under the privacy rules related to individually identifiable health information in violation of 45 C.F.R. § 164.306(a)(3);

k.    Failing to ensure compliance with HIPAA security standard rules by Defendant's workforce in violation of 45 C.F.R. § 164.306(a)(4);

l.    Failing to train all members of Defendant's workforce effectively on the policies and procedures about PHI as necessary and appropriate for the members of its workforces to carry out their functions and to maintain security of PHI, in violation of 45 C.F.R. § 164.530(b); and/or

m.    Failing to render the electronic PHI they maintained unusable, unreadable, or indecipherable to unauthorized individuals, as they had not encrypted the electronic PHI as specified in the HIPAA Security Rule by "the use of an algorithmic process to transform data into a form in which there is a low probability of assigning meaning without use of a confidential process or key" (45 C.F.R. § 164.304, definition of "encryption").

94.    As the result of computer systems needing security upgrading, inadequate procedures for handling emails containing ransomware or other malignant computer code, and inadequately trained employees who opened files containing the ransomware virus, Defendant negligently and unlawfully failed to safeguard Plaintiff's and Class Members' Private Information.

95.    Plaintiff and Class Members now face an increased risk of fraud and identity theft.

***PLAINTIFF AND THE CLASS MEMBERS HAVE AND WILL EXPERIENCE SUBSTANTIAL HARM***

96.    Plaintiff and members of the proposed Class have suffered injury from the misuse of their PII and PHI that can be directly traced to Defendant.

97.    The ramifications of Defendant's failure to keep Plaintiff's and the Class's PII and PHI secure are severe. Identity theft occurs when someone uses another's personal information such as that person's name, account number, Social Security number, driver's license number, date of birth, and/or other information, without permission, to commit fraud or other crimes. According to experts, one out of four data breach notification recipients become a victim of identity fraud.

98.    Because of Defendant's failures to prevent—and to timely detect—the Data Breach, Plaintiff and the proposed Class have suffered and will continue to suffer damages, including monetary losses, lost time, anxiety, and emotional distress. They have suffered or are at an increased risk of suffering:

- The loss of the opportunity to control how their PII and PHI is used;

- The diminution in value of their PII and PHI;

- The compromise and continuing publication of their PII and PHI;

- Out-of-pocket costs associated with the prevention, detection, recovery, and remediation from identity theft or fraud;

- Lost opportunity costs and lost wages associated with the time and effort expended addressing and attempting to mitigate the actual and consequences of the Data Breach, including, but not limited to, efforts spent researching how to prevent, detect, contest, and recover from identity theft and fraud;

- Delay in receipt of tax refund monies; Unauthorized use of stolen PII and PHI; and

- The continued risk to their PII and PHI, which remains in the possession of Defendant and is subject to further breaches so long as Defendant fails to undertake the appropriate measures to protect the PII and PHI in its possession.

99. Stolen PII is one of the most valuable commodities on the criminal information black market. According to Experian, a credit-monitoring service, stolen PII can be worth up to $1,000.00 depending on the type of information obtained.

100. The value of Plaintiff's and the proposed Class's PII on the black market is considerable. Stolen PII trades on the black market for years, and criminals often post stolen private information openly and directly on various "dark web" internet websites, making the information publicly available, for a substantial fee of course.

101. It can take victims years to spot identity or PII theft, giving criminals plenty of time to abuse that information for money.

102. One such example of criminals using PII for profit is the development of "Fullz" packages.

103. Cyber-criminals can cross-reference two sources of PII to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy to assemble complete dossiers on individuals. These dossiers are known as "Fullz" packages.

104. The development of "Fullz" packages means that stolen PII from the Data Breach can

easily be used to link and identify it to Plaintiff's and the proposed Class's phone numbers, email addresses, and other unregulated sources and identifiers. In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the PII stolen by the cyber-criminals in the Data Breach, criminals can easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over. That is exactly what is happening to Plaintiff and members of the proposed Class, and it is reasonable for any trier of fact, including this Court or a jury, to find that Plaintiff's and other members of the proposed Class's stolen PII is being misused, and that such misuse is traceable to the Data Breach.

105.    According to the FBI's Internet Crime Complaint Center (IC3) 2019 Internet Crime Report, Internet-enabled crimes reached their highest number of complaints and dollar losses that year, resulting in more than $3.5 billion in losses to individuals and business victims, and the numbers are only rising.

106.    Further, according to the same report, "rapid reporting can help law enforcement stop fraudulent transactions before a victim loses the money for good" Defendant did not rapidly report to Plaintiff and the Class that their PII had been stolen.

107.    Victims of identity theft also often suffer embarrassment, blackmail, or harassment in person or online, and/or experience financial losses resulting from fraudulently opened accounts or misuse of existing accounts.

108.    In addition to out-of-pocket expenses that can exceed thousands of dollars and the emotional toll identity theft can take, some victims must spend a considerable time repairing the damage caused by the theft of their PII. Victims of new account identity theft will likely have to spend time correcting fraudulent information in their credit reports and continuously monitor their reports for future inaccuracies, close existing bank/credit accounts, open new ones, and dispute charges with creditors.

109.    Further complicating the issues faced by victims of identity theft, data thieves may wait years before attempting to use the stolen PII. To protect themselves, Plaintiff and the Class will need to remain vigilant against unauthorized data use for years or even decades to come.

110.    The Federal Trade Commission ("FTC") has also recognized that consumer data is a

new and valuable form of currency. In an FTC roundtable presentation, former Commissioner Pamela Jones Harbour stated that "most consumers cannot begin to comprehend the types and amount of information collected by businesses, or why their information may be commercially valuable. Data is currency."[30]

111.    The FTC has also issued many guidelines for businesses that highlight the importance of reasonable data security practices. The FTC has noted the need to factor data security into all business decision-making. According to the FTC, data security requires:

- encrypting information stored on computer networks;

- retaining payment card information only as long as necessary;

- properly disposing of personal information that is no longer needed;

- limiting administrative access to business systems;

- using industry-tested and accepted methods for securing data;

- monitoring activity on networks to uncover unapproved activity;

- verifying that privacy and security features function properly;

- testing for common vulnerabilities; and

- updating and patching third-party software.

112.    According to the FTC, unauthorized PII disclosures ravage consumers' finances, credit history and reputation, and can take time, money and patience to resolve the fallout.[31]

113.    The FTC treats the failure to employ reasonable and appropriate measures to protect

---

[30] Statement of FTC Commissioner Pamela Jones Harbour-Remarks Before FTC Exploring Privacy Roundtable, (Dec. 7, 2009) (last visited September 4, 2025).

[31] *See* Taking Charge, What to Do If Your Identity is Stolen, FTC, at 3 (2012), *available at* https://www.ojp.gov/ncjrs/virtual-library/abstracts/taking-charge-what-do-if-your-identity-stolen (last visited September 4, 2025 ).

1  against unauthorized access to confidential consumer data as an unfair act or practice prohibited by

2  Section 5(a) of the FTC Act.

3       114.    Defendant's failure to properly notify Plaintiff and Class Members of the Data Breach

4  exacerbated Plaintiff's and Class Members' injury by depriving them of the earliest ability to take

5  appropriate measures to protect their PHI and PII and take other necessary steps to mitigate the harm

6  caused by the Data Breach.

7       115.    Plaintiff and Class Members now face an increased risk of fraud and identity theft.

8  ***DATA BREACHES PUT CONSUMERS AT AN INCREASED RISK OF FRAUD AND IDENTITY THEFT***

9       116.    Data Breaches such as the one experienced by Defendant's patients are especially

10  problematic because of the disruption they cause to the daily lives of victims affected by the attack.

11      117.    The United States Government Accountability Office released a report in 2007

12  regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face

13  "substantial costs and time to repair the damage to their good name and credit record."[32]

14      118.    The FTC recommends that identity theft victims take several steps to protect their

15  personal and financial information after a data breach, including contacting one of the credit bureaus

16  to place a fraud alert (possibly an extended fraud alert that lasts for 7 years if someone steals their

17  identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their

18  accounts, placing a credit freeze on their credit, and correcting their credit reports.[33]

19      119.    Identity thieves use stolen personal information such as Social Security numbers for

20  various crimes, including credit card fraud, phone or utilities fraud, and bank/finance fraud.

21      120.    Identity thieves can also use Social Security numbers to obtain a driver's license or

22  official identification card in the victim's name but with the thief's picture; use the victim's name and

23  Social Security number to obtain government benefits; or file a fraudulent tax return using the victim's

24  information. In addition, identity thieves may obtain a job using the victim's Social Security number,

---

[32] U.S. Government Accountability Office, *Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown* (June 2007), *available at* https://www.gao.gov/new.items/d07737.pdf (last visited September 4, 2025) ("GAO Report").

[33] Federal Trade Commission, *What To Do Right Away* (2024), *available at* https://www.identitytheft.gov/Steps (last visited September 4, 2025).

1    rent a house or receive medical services in the victim's name, and may even give the victim's personal

2    information to police during an arrest resulting in an arrest warrant being issued in the victim's name.

3    121.    Theft of Private Information is gravely serious. PII/PHI is a valuable property right.[34]

4    Its value is axiomatic, considering the value of Big Data in corporate America and the consequences

5    of cyber thefts include heavy prison sentences. Even this obvious risk to reward analysis illustrates

6    beyond doubt that Private Information has considerable market value.

7    122.    Theft of PHI is also gravely serious: "A thief may use your name or health insurance

8    numbers to see a doctor, get prescription drugs, file claims with your insurance provider, or get other

9    care. If the thief's health information is mixed with yours, your treatment, insurance and payment

10    records, and credit report may be affected."[35] Drug manufacturers, medical device manufacturers,

11    pharmacies, hospitals and other healthcare service providers often purchase PII/PHI on the black

12    market for the purpose of target marketing their products and services to the physical maladies of the

13    data breach victims themselves. Insurance companies purchase and use wrongfully disclosed PHI to

14    adjust their insureds' medical insurance premiums.

15    123.    It must also be noted there may be a substantial time lag—measured in years—

16    between when harm occurs versus when it is discovered, and between when Private Information

17    and/or financial information is stolen and when it is used. According to the U.S. Government

18    Accountability Office, which studied data breaches:

19    [L]aw enforcement officials told us that in some cases, stolen data may

20    be held for up to a year or more before being used to commit identity theft.

21    Further, once stolen data have been sold or posted on the Web, fraudulent

22    use of that information may continue for years. As a result, studies that

23    attempt to measure the harm resulting from data breaches cannot

24

25

---

26    [34] *See, e.g.,* John T. Soma, et al, *Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("PII")*
*Equals the "Value" of Financial Assets*, 15 Rich. J.L. & Tech. 11, at *3-4 (2009) ("PII, which companies obtain at little

27    cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.")
(citations omitted).

28    [35] *See* Federal Trade Commission, *Medical Identity Theft, available at* http://www.consumer.ftc.gov/articles/0171-
medical-identity-theft (last visited September 4, 2025).

necessarily rule out all future harm.

*See* GAO Report, at p. 29.

124.    Private Information and financial information are such valuable commodities to identity thieves that once the information has been compromised, criminals often trade the information on the "cyber black market" for years.

125.    There is a strong probability that all the stolen information has been dumped on the black market or will be dumped on the black market, meaning Plaintiff and Class Members are at an increased risk of fraud and identity theft for many years into the future. Thus, Plaintiff and Class Members must vigilantly monitor their financial and medical accounts for many years to come.

126.    Sensitive Private Information can sell for as much as $363 per record according to the Infosec Institute.[36]

127.    PII is particularly valuable because criminals can use it to target victims with frauds and scams. Once PII is stolen, fraudulent use of that information and damage to victims may continue for years.

128.    For example, the Social Security Administration has warned that identity thieves can use an individual's Social Security number to apply for more credit lines.[37]

129.    Such fraud may go undetected until debt collection calls commence months, or even years, later. Stolen Social Security Numbers also make it possible for thieves to file fraudulent tax returns, file for unemployment benefits, or apply for a job using a false identity.[38]

130.    Each of these fraudulent activities is difficult to detect. An individual may not know that his or her Social Security Number was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

---

[36] Ashiq Ja, *Hackers Selling Healthcare Data in the Black Market*, InfoSec (July 27, 2015), *available at* https://resources.infosecinstitute.com/topic/hackers-selling-healthcare-data-in-the-black-market/ (last visited September 4, 2025).
[37] Social Security Administration, *Identity Theft and Your Social Security Number* (2018), *available at* https://www.ssa.gov/pubs/EN-05-10064.pdf (last visited September 4, 2025).
[38] *Id* at 4.

131.    It is also hard to change or cancel a stolen Social Security number.

132.    An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. Even then, a new Social Security number may not be effective, as "[t]he credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[39]

133.    Defendant therefore knew or should have known this and strengthened its data systems accordingly. Defendant was put on notice of the substantial and foreseeable risk of harm from a data breach, yet it failed to properly prepare for that risk.

***The Data Breach Was Foreseeable: Defendant Knew, or Should Have Known, of the Risk Because Healthcare Entities in Possession of Private Information are Particularly Susceptible to Cyber Attacks***

134.    Defendant knew or should have known of the risk of a data breach, especially because healthcare entities in possession of Private Information are particularly susceptible to cyber attacks.

135.    Defendant's data security obligations were particularly important given the substantial increase in cyber-attacks and/or data breaches targeting healthcare entities that collect and store Private Information, like Defendant, preceding the date of the breach.

136.    Data breaches, including those perpetrated against healthcare entities that store Private Information in their systems, have become widespread.

137.    In 2023, an all-time high for data compromises occurred, with 3,205 compromises affecting 353,027,892 total victims.  Of the 3,205 recorded data compromises, 809 of them, or 25.2% were in the medical or healthcare industry. The estimated number of organizations impacted by data compromises has increased by +2,600 percentage points since 2018, and the estimated number of victims has increased by +1400 percentage points.  The 2023 compromises represent a 78-percentage point increase over the previous year and a 72-percentage point hike from the previous all-time high number of compromises (1,860) set in 2021.

---

[39] Brian Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (February 9, 2015), *available at* http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millions-worrying-about-identity-theft (last visited September 4, 2025).

138.    In light of recent high profile cybersecurity incidents at other healthcare partner and provider companies, including HCA Healthcare (11 million patients, July 2023), Managed Care of North America (8 million patients, March 2023), PharMerica Corporation (5 million patients, March 2023), HealthEC LLC (4 million patients, July 2023), ESO Solutions, Inc. (2.7 million patients, September 2023), Prospect Medical Holdings, Inc. (1.3 million patients, July-August 2023), Defendant knew or should have known that its electronic records would be targeted by cybercriminals.

139.    Indeed, cyber-attacks, such as the one experienced by Defendant, have become so notorious that the Federal Bureau of Investigation ("FBI") and U.S. Secret Service have issued a warning to potential targets so they are aware of, and prepared for, a potential attack. As one report explained, smaller entities that store Private Information are "attractive to ransomware criminals…because they often have lesser IT defenses and a high incentive to regain access to their data quickly."[40]

140.    Additionally, as companies became more dependent on computer systems to run their business,[41] *e.g.*, working remotely as a result of the Covid-19 pandemic, and the Internet of Things ("IoT"), the danger posed by cybercriminals is magnified, thereby highlighting the need for adequate administrative, physical, and technical safeguards.[42]

141.    Defendant knew and understood unprotected or exposed Private Information in the custody of healthcare companies, like Defendant, is valuable and highly sought after by nefarious third parties seeking to illegally monetize that Private Information through unauthorized access.

142.    At all relevant times, Defendant knew, or reasonably should have known, of the importance of safeguarding the Private Information of Plaintiff and Class Members and of the foreseeable consequences that would occur if Defendant's data security system was breached, including, specifically, the significant costs that would be imposed on Plaintiff and Class Members

---

[40]https://www.law360.com/patientprotection/articles/1220974/fbi-secret-service-warn-of-targeted-ransomware?nl_pk=3ed44a08-fcc2-4b6c-89f0aa0155a8bb51&utm_source=newsletter&utm_medium=email&utm_campaign=patientprotection
[41]https://www.federalreserve.gov/econres/notes/feds-notes/implications-of-cyber-risk-for-financial-stability-20220512.html
[42] https://www.picussecurity.com/key-threats-and-cyber-risks-facing-financial-services-and-banking-firms-in-2022

as a result of a breach.

143.    Plaintiff and Class Members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. The Class is incurring and will continue to incur such damages in addition to any fraudulent use of their Private Information.

144.    The injuries to Plaintiff and Class Members were directly and proximately caused by Defendant's failure to implement or maintain adequate data security measures for the Private Information of Plaintiff and Class Members.

145.    The ramifications of Defendant's failure to keep secure the Private Information of Plaintiff and Class Members are long lasting and severe. Once Private Information is stolen— particularly Social Security numbers and PHI—fraudulent use of that information and damage to victims may continue for years.

146.    As a healthcare entity in custody of the Private Information of its patients, Defendant knew, or should have known, the importance of safeguarding Private Information entrusted to it by Plaintiff and Class Members, and of the foreseeable consequences if its data security systems were breached. This includes the significant costs imposed on Plaintiff and Class Members as a result of a breach. Defendant failed, however, to take adequate cybersecurity measures to prevent the Data Breach.

## VI.    PLAINTIFF'S EXPERIENCE

147.    Plaintiff Shanett Noble is and at all times mentioned herein was an individual citizen of Nevada, residing in the city of Las Vegas.

148.    Plaintiff provided Defendant with her sensitive PII and PHI a to obtain dental care services. Plaintiff received notice of the Data Breach around August 26, 2025, informing her that her sensitive information was part of Defendant's Data Breach (Exhibit A).

149.    Plaintiff is careful about sharing her sensitive Private Information. Plaintiff has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source.

150.    Plaintiff stores any documents containing her sensitive Private Information in a safe and secure location or destroys the documents. Moreover, Plaintiff diligently chooses unique

1    usernames and passwords for her sensitive online accounts.

2        151.    Had Plaintiff been aware that Defendant's computer systems were not secure, she

3    would not have entrusted her personal data to Defendant.

4        152.    Because of the Data Breach, Defendant advised Plaintiff to take certain steps to protect

5    her Private Information and otherwise mitigate her damages.

6        153.    Because of the Data Breach, Plaintiff spent time dealing with the consequences of the

7    Data Breach, which includes time spent verifying the legitimacy of the Notice of Data Breach and

8    self-monitoring her accounts to ensure no fraudulent activity has occurred. This time has been lost

9    forever and cannot be recaptured. This time was spent at Defendant's direction by way of the Data

10    Breach notice where Defendant recommended that Plaintiff mitigate her damages by, among other

11    things, monitoring her accounts for fraudulent activity.

12        154.    Even with the best response, the harm caused to Plaintiff cannot be undone.

13        155.    Plaintiff suffered actual injury in the form of damages to and diminution in the value

14    of Plaintiff's Private Information—a form of intangible property that Plaintiff entrusted to Defendant,

15    which was compromised in and because of the Data Breach. Plaintiff suffered lost time, annoyance,

16    interference, and inconvenience because of the Data Breach and have anxiety and increased concerns

17    for the loss of her privacy.

18        156.    Plaintiff has suffered imminent and impending injury arising from the exacerbated risk

19    of fraud, identity theft, and misuse resulting from their Private Information being placed in the hands

20    of criminals.

21        157.    Plaintiff has a continuing interest in ensuring that his Private Information, which, upon

22    information and belief, remains backed up in Defendant's possession, is protected, and safeguarded

23    from future breaches

24        **VII.    PLAINTIFF AND CLASS MEMBERS DAMAGES**

25        158.    To date, Defendant has done little to provide Plaintiff and Class Members with relief

26    for the damages they have suffered because of the Data Breach, including, but not limited to, the costs

27    and loss of time they incurred because of the Data Breach. Defendant has only offered inadequate

28    identity monitoring services, despite Plaintiff and Class Members being at risk of identity theft and

fraud for the remainder of their lifetimes.

159.   The credit monitoring offered to persons whose Private Information was compromised is wholly inadequate as it fails to provide for the fact that victims of data breaches and other unauthorized disclosures commonly face multiple years of ongoing identity theft and financial fraud. What's more, Defendant places the burden on Plaintiff and Class Members by requiring them to expend time signing up for that service rather than automatically enrolling all victims of this Data Breach.

160.   Defendant's credit monitoring advice to Plaintiff and Class Members places the burden on Plaintiff and Class Members, rather than on Defendant, to investigate and protect themselves from Defendant's tortious acts resulting in the Data Breach.

161.   Plaintiff and Class Members have been damaged by the compromise and exfiltration of their Private Information in the Data Breach, and by the severe disruption to their lives as a direct and foreseeable consequence of this Data Breach.

162.   Plaintiff's Private Information was compromised and exfiltrated by cyber-criminals as a direct and proximate result of the Data Breach.

163.   Plaintiff and Class Members were damaged in that their Private Information is in the hands of cyber criminals.

164.   As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have been placed at an actual, present, immediate, and continuing increased risk of harm from fraud and identity theft.

165.   As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have been forced to expend time dealing with the effects of the Data Breach.

166.   Plaintiff and Class Members face substantial risk of out-of-pocket fraud losses such as loans opened in their names, medical services billed in their names, tax return fraud, utility bills opened in their names, credit card fraud, and similar identity theft.

167.   Plaintiff and Class Members face substantial risk of being targeted for future phishing, data intrusion, and other illegal schemes based on their Private Information as potential fraudsters could use that information to more effectively target such schemes to Plaintiff and Class Members.

168.    Plaintiff and Class Members may also incur out-of-pocket costs for protective measures such as credit monitoring fees, credit report fees, credit freeze fees, and similar costs directly or indirectly related to the Data Breach.

169.    Plaintiff and Class Members also suffered a loss of value of their Private Information when it was acquired by cyber thieves in the Data Breach. Many courts have recognized the propriety of loss of value damages in related cases.

170.    Plaintiff and Class Members have spent and will continue to spend significant amounts of time to monitor their financial accounts and records for misuse.

171.    Plaintiff and Class Members have suffered or will suffer actual injury as a direct result of the Data Breach. Many victims suffered ascertainable losses in the form of out-of-pocket expenses and the value of their time reasonably incurred to remedy or mitigate the effects of the Data Breach relating to:

a.    Finding fraudulent charges;

b.    Canceling and reissuing credit and debit cards;

c.    Purchasing credit monitoring and identity theft prevention;

d.    Addressing their inability to withdraw funds linked to compromised accounts;

e.    Taking trips to banks and waiting in line to obtain funds held in limited accounts;

f.    Placing "freezes" and "alerts" with credit reporting agencies;

g.    Spending time on the phone with or at a financial institution to dispute fraudulent charges;

h.    Contacting financial institutions and closing or modifying financial accounts;

i.    Resetting automatic billing and payment instructions from compromised credit and debit cards to new ones;

j.    Paying late fees and declined payment fees imposed because of failed automatic payments that were tied to compromised cards that had to be cancelled; and

k.    Closely reviewing and monitoring bank accounts and credit reports for

1    unauthorized activity for years to come.

2    172.    Moreover, Plaintiff and Class Members have an interest in ensuring that their Private

3  Information, which is believed to remain in the possession of Defendant, is protected from further

4  breaches by implementing security measures and safeguards, including, but not limited to, making

5  sure that the storage of data or documents containing personal and financial information is

6  inaccessible online and that access to such data is password protected.

7    173.    Further, because of Defendant's conduct, Plaintiff and Class Members are forced to

8  live with the anxiety that their Private Information —which contains the most intimate details about

9  a person's life—may be disclosed to the entire world, thereby subjecting them to embarrassment and

10  depriving them of any right to privacy whatsoever.

11    174.    As a direct and proximate result of Defendant's actions and inactions, Plaintiff and

12  Class Members have suffered anxiety, emotional distress, and loss of privacy, and are at an increased

13  risk of future harm.

14    **VIII.    CLASS REPRESENTATION ALLEGATIONS**

15    175.    This action is brought and may be properly maintained as a class action pursuant to

16  Fed. R. Civ. P. 23.

17    176.    Plaintiff brings this action on behalf of herself and on behalf of all other persons

18  similarly situated.

19    177.    Plaintiff proposes the following Class definition, subject to amendment as appropriate:

20    **All persons whose Private Information was compromised because of the**

21    **February 19, 2025, through March 5, 2025, Data Breach (the "Class").**

22

23    178.    Excluded from the Class are Defendant's officers and directors, and any entity in

24  which Defendant has a controlling interest; and the affiliates, legal representatives, attorneys,

25  successors, heirs, and assigns of Defendant. Excluded also from the Class are Members of the

26  judiciary to whom this case is assigned, their families and Members of their staff.

27    179.    Plaintiff reserves the right to amend or modify the class definitions with greater

28

1    specificity or division after having an opportunity to conduct discovery.

2    180.    This action satisfies the numerosity, commonality, typicality, and adequacy of

3    requirements under Fed. R. Civ. P. 23.

4    181.    <u>Numerosity</u>.  In accordance with Fed. R. Civ. P. 23(a)(1), the Members of the Class

5    are so numerous that joinder of all of them is impracticable. The exact number of Class Members is

6    unknown to Plaintiff now, but Defendant has provided notice to the Oregon Department of Justice

7    that the number includes at least 1,223,635 individuals.[43]

8    182.    <u>Commonality</u>. In satisfaction of Fed. R. Civ. P. 23(a)(2), there are questions of law

9    and fact common to the Class, which predominate over any questions affecting only individual Class

10   Members. These common questions of law and fact include, without limitation:

a.    Whether Defendant unlawfully used, maintained, lost, or disclosed Plaintiff's and Class Members' Private Information;

b.    Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

c.    Whether Defendant's data security systems prior to and during the Data Breach complied with applicable data security laws and regulations;

d.    Whether Defendant's data security systems prior to and during the Data Breach adhered to industry standards;

e.    Whether Defendant owed a duty to Class Members to safeguard their Private Information;

f.    Whether Defendant breached its duty to Class Members to safeguard their Private Information;

g.    Whether Defendant knew or should have known that its data security systems and monitoring processes were deficient;

h.    Whether Plaintiff and Class Members suffered legally cognizable damages from Defendant's misconduct;

i.    Whether Defendant's conduct was negligent;

j.    Whether Defendant's conduct was *per se* negligent;

---

[43] https://justice.oregon.gov/consumer/databreach/

k.  Whether Defendant's acts, inactions, and practices complained of herein amount to acts of intrusion upon seclusion under the law;

l.  Whether Defendant was unjustly enriched;

m.  Whether Defendant failed to provide notice of the Data Breach promptly; and

n.  Whether Plaintiff and Class Members are entitled to damages, civil penalties, punitive damages, and/or injunctive relief.

183.  Typicality. Pursuant to Fed. R. Civ. P. 23(a)(3) Plaintiff's claims are typical of those of other Class Members because Plaintiff's Private Information, like that of every other Class member, was compromised in the Data Breach. Plaintiff's claims are typical of those of the other Class Members because, among other things, all Class Members were injured through the common misconduct of Defendant. Plaintiff is advancing the same claims and legal theories on behalf of herself and all other Class Members, and no defenses are unique to Plaintiff. Plaintiff's claims and those of Class Members arise from the same operative facts and are based on the same legal theories.

184.  Adequacy of Representation. As Fed. R. Civ. P. 23(a)(4) requires Plaintiff will fairly and adequately represent and protect the interests of the Members of the Class. Plaintiff's Counsel is competent and experienced in litigating class actions, including data privacy litigation of this kind.

185.  Predominance. Defendant has engaged in a common course of conduct toward Plaintiff and Class Members, in that all Plaintiff's and Class Members' data was stored on the same computer systems and unlawfully accessed in the same way. The common issues arising from Defendant's conduct affecting Class Members set out above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

186.  Superiority. A Class action is superior to other available methods for the fair and efficient adjudication of the controversy. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a class action, most Class Members would likely find that the cost of litigating their individual claims is prohibitively high and would therefore have no effective remedy.

187.  This class action is maintainable under Fed. R. Civ. P. 23 because the prosecution of

separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for Defendant. In contrast, the conduct of this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class member.

188.    This class action is maintainable under Fed. R. Civ. P. 23 because Defendant has acted on grounds that apply generally to the Class as a whole, so that class certification, injunctive relief, and corresponding declaratory relief are appropriate on a Class-wide basis.

189.    Likewise, issues that will arise in this case are appropriate for certification under Fed. R. Civ. P. 23 because such issues are common to the Class, the resolution of which would advance matter and the parties' interests therein. Such issues include, but are not limited to:

a.    Whether Defendant failed to timely notify the public of the Data Breach;

b.    Whether Defendant owed a legal duty to Plaintiff and the Class to exercise due care in collecting, storing, and safeguarding their Private Information;

c.    Whether Defendant's security measures to protect their data systems were reasonable considering best practices recommended by data security experts;

d.    Whether Defendant's failure to institute adequate protective security measures amounted to negligence;

e.    Whether Defendant failed to take commercially reasonable steps to safeguard consumer Private Information; and

f.    Whether adherence to FTC data security recommendations, and measures recommended by data security experts would have reasonably prevented the Data Breach.

190.    Finally, all members of the proposed Class are readily ascertainable. Defendant has access to Class Members' names and addresses affected by the Data Breach. Class Members have already been preliminarily identified and sent notice of the Data Breach by Defendant.

## IX.    CAUSES OF ACTION

### FIRST COUNT
### NEGLIGENCE
**(On Behalf of Plaintiff and All Class Members)**

191.    Plaintiff re-alleges and incorporates the above allegations as if fully set forth herein.

192.    Defendant required Plaintiff and Class Members to submit non-public personal information as a condition of obtaining or receiving dental care services.

193.    By collecting and storing this data in Defendant's computer property, and sharing it and using it for commercial gain, Defendant had a duty of care to use reasonable means to secure and safeguard its computer property—and Class Members' Private Information held within it—to prevent disclosure of the information, and to safeguard the information from theft. Defendant's duty included a responsibility to implement processes by which it could detect a breach of its security systems in a reasonably expeditious period and to give prompt notice to those affected in the case of a Data Breach.

194.    Defendant owed a duty of care to Plaintiff and Class Members to provide data security consistent with industry standards and other requirements discussed herein, and to ensure that its systems and networks, and the personnel responsible for them, adequately protected the Private Information.

195.    Defendant's duty of care to use reasonable security measures arose because of the special relationship that existed between Defendant and its patients, which is recognized by laws and regulations including, but not limited to, HIPAA, as well as common law. Defendant could ensure that its systems were sufficient to protect against the foreseeable risk of harm to Class Members from a data breach.

196.    Defendant's duty to use reasonable security measures under HIPAA required Defendant to "reasonably protect" confidential data from "any intentional or unintentional use or disclosure" and to "have in place appropriate administrative, technical, and physical safeguards to protect the privacy of protected health information." 45 C.F.R. § 164.530(c)(1). Some or all the healthcare information at issue constitutes "protected health information" within the meaning of

1   HIPAA.

2     197.   In addition, Defendant had a duty to employ reasonable security measures under

3 Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices

4 in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of

5 failing to use reasonable measures to protect confidential data.

6     198.   Defendant's duty to use reasonable care in protecting confidential data arose not only

7 because of the statutes and regulations described above, but also because Defendant is bound by

8 industry standards to protect confidential Private Information.

9     199.   Defendant breached its duties, and thus was negligent, by failing to use reasonable

10 measures to protect Class Members' Private Information. The specific negligent acts and omissions

11 committed by Defendant include, but are not limited to, the following:

- Failing to adopt, implement, and maintain adequate security measures to safeguard Class Members' Private Information;

- Failing to adequately monitor the security of its networks and systems;

- Failing to periodically ensure that its email system had plans in place to maintain reasonable data security safeguards;

- Allowing unauthorized access to Class Members' Private Information;

- Failing to detect timely that Class Members' Private Information had been compromised;

- Failing to timely notify Class Members about the Data Breach so that they could take appropriate steps to mitigate the potential for identity theft and other damages; and

- Failing to secure its stand-alone personal computers, such as the reception desk computers, even after discovery of the data breach.

200.   It was foreseeable that Defendant's failure to use reasonable measures to protect Class

Members' Private Information would result in injury to Class Members. Further, the breach of

security was reasonably foreseeable given the known high frequency of cyberattacks and data

breaches in the healthcare industry.

201.   It was therefore foreseeable that the failure to adequately safeguard Class Members'

Private Information would result in one or more types of injuries to Class Members.

202. Plaintiff and Class Members are entitled to compensatory and consequential damages suffered because of the Data Breach.

203. Defendant's negligent conduct is ongoing, in that they still hold the Private Information of Plaintiff and Class Members in an unsafe and unsecure manner.

204. Plaintiff and Class Members are also entitled to injunctive relief requiring Defendant to (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) provide adequate credit monitoring to all Class Members.

### SECOND COUNT
### BREACH OF IMPLIED CONTRACT
#### (On Behalf of Plaintiff and All Class Members)

205. Plaintiff re-alleges and incorporate the above allegations as if fully set forth herein.

206. When Plaintiff and Class Members provided their Private Information to Defendant in exchange for obtaining or receiving dental care services, they entered implied contracts with Defendant under which Defendant agreed to reasonably protect such information.

207. Defendant solicited, offered, and invited Class Members to provide their Private Information as part of Defendant's regular business practices. Plaintiff and Class Members accepted Defendant's offers and provided their Private Information to Defendant.

208. In entering such implied contracts, Plaintiff and Class Members reasonably believed and expected that Defendant's data security practices complied with relevant federal and state laws and regulations, including HIPAA, and adhered to industry standards.

209. Plaintiff and Class Members paid money to Defendant or provided labor to Defendant with the reasonable belief and expectation that Defendant would use part of its earnings to obtain adequate data security. Defendant failed to do so.

210. Plaintiff and Class Members would not have entrusted their Private Information to Defendant in the absence of the implied contract between them and Defendant to keep their information reasonably secure.

211.    Plaintiff and Class Members would not have entrusted their Private Information to Defendant in the absence of its implied promise to monitor its computer systems and networks to ensure that they adopted reasonable data security measures.

212.    Plaintiff and Class Members fully and adequately performed their obligations under the implied contracts with Defendant.

213.    Defendant breached its implied contracts with Class Members by failing to safeguard and protect their Private Information.

214.    As a direct and proximate result of Defendant's breach of the implied contracts, Class Members sustained damages as alleged here, including the loss of the benefit of the bargain.

215.    Plaintiff and Class Members are entitled to compensatory, consequential, and nominal damages suffered because of the Data Breach.

216.    Plaintiff and Class Members are also entitled to injunctive relief requiring Defendant to, e.g., (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) immediately provide adequate credit monitoring to all Class Members.

### THIRD COUNT
### UNJUST ENRICHMENT
### (On Behalf of Plaintiff and All Class Members)

217.    Plaintiff re-alleges and incorporates the above allegations as if fully set forth herein.

218.    Plaintiff brings this claim individually and on behalf of all Class Members. This count is pled in the alternative to the breach of implied contract count above.

219.    Upon information and belief, Defendant funds its data security measures entirely from its general revenue, including payments made by or on behalf of Plaintiff and the Class Members.

220.    As such, a portion of the payments made by or on behalf of Plaintiff and the Class Members is to be used to provide a reasonable level of data security, and the portion of each payment made that is allocated to data security is known to Defendant.

221.    Plaintiff and Class Members conferred a monetary benefit on Defendant. Defendant's acceptance and storage of Plaintiff's and the other Class members' Private Information created a

fiduciary relationship between Defendant on the one hand, and Plaintiff and the other Class members, on the other hand. In light of this relationship, Defendant must act primarily for the benefit of its employees, clients, patients, and/or customers, which includes safeguarding and protecting Plaintiff's and the other Class members' Private Information.

222.    Defendant knew that Plaintiff and Class Members conferred a benefit which Defendant accepted. Defendant profited from these transactions and used the Private Information of Plaintiff and Class Members for business purposes.

223.    Defendant enriched itself by saving the costs Defendant reasonably should have expended on data security measures to secure Plaintiff's and Class Members' Personal Information. Rather than providing a reasonable level of security that would have prevented the hacking incident, Defendant instead calculated to increase its own profits at the expense of Plaintiff and Class Members by using cheaper, ineffective security measures. Plaintiff and Class Members, on the other hand, suffered as a direct and proximate result of Defendant's decision to prioritize its own profits over the requisite security.

224.    Under the principles of equity and good conscience, Defendant should not be permitted to retain the money belonging to Plaintiff and Class Members, because Defendant failed to implement appropriate data management and security measures that are mandated by industry standards.

225.    Defendant failed to secure Plaintiff's and Class Members' Private Information and thus did not provide full compensation for the benefit Plaintiff and Class Members provided.

226.    Defendant acquired the Private Information through inequitable means in that they failed to disclose the inadequate security practices alleged.

227.    If Plaintiff and Class Members knew that Defendant had not reasonably secured their Private Information, they would not have agreed to provide their Private Information to Defendant.

228.    Plaintiff and Class Members have no adequate remedy at law.

229.    As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have suffered and will suffer injury, including but not limited to:

a.    actual identity theft;

b.    the loss of the opportunity of how their Private Information is used;

c.    the compromise, publication, and/or theft of their Private Information;

d.    out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, and/or unauthorized use of their Private Information;

e.    lost opportunity costs associated with efforts expended and the loss of productivity addressing and attempting to mitigate the consequences of the Data Breach, including, but not limited to, efforts spent researching how to prevent, detect, contest, and recover from identity theft;

f.    the continued risk to their Private Information, which remains in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect Private Information in its continued possession; and

g.    future costs in terms of time, effort, and money to be expended to prevent, detect, contest, and repair the effect of the Private Information compromised because of the Data Breach for the rest of the lives of Plaintiff and Class Members.

230.    As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have suffered and will continue to suffer other forms of injury and/or harm.

231.    Defendant should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiff and Class Members, proceeds that they unjustly received from them. In the alternative, Defendant should be compelled to refund the amounts that Plaintiff and Class Members overpaid for Defendant's services.

## X.    PRAYER FOR RELIEF

232.    WHEREFORE, Plaintiff, on behalf of herself and the Class described above seek the following relief:

a.    For an Order certifying this action as a class action, defining the Class as requested herein, appointing Plaintiff and their counsel to represent the Class, and finding that Plaintiff are proper representatives of the Class requested herein;

b.    For equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein relating to the misuse and/or disclosure

of Plaintiff's and Class Members' Private Information, and from refusing to issue prompt, complete and accurate disclosures to Plaintiff and Class Members;

c.    For equitable relief compelling Defendant to use appropriate methods and policies related to consumer data collection, storage, and safety, and to disclose with specificity the type of Private Information compromised during the Data Breach;

d.    For equitable relief requiring restitution and disgorgement of the revenues wrongfully retained because of Defendant's wrongful conduct;

e.    Ordering Defendant to pay for not less than ten years of credit monitoring services for Plaintiff and the Class;

f.    For an award of actual damages, compensatory damages, statutory damages, and statutory penalties, in an amount to be determined, as allowable by law;

g.    For an award of punitive damages, as allowable by law;

h.    For an award of attorneys' fees and costs, and any other expense, including expert witness fees;

i.    Pre- and post-judgment interest on any amounts awarded; and

j.    Any other relief that this court may deem just and proper.

# XI.    JURY TRIAL DEMANDED

Plaintiff demands a trial by jury on all claims so triable.

Dated: September 17, 2025

**DE CASTROVERDE LAW GROUP**

*/s/ Ryan Samano*
Ryan Samano
Nevada Bar No. 15995
Ryan@dlgteam.com
1149 S. Maryland Pkwy
Las Vegas, NV 89104
(702) 222-9999

**EKSM, LLP**

Leigh S. Montgomery*
Texas Bar No. 24052214
lmontgomery@eksm.com
4200 Montrose Blvd., Suite 200
Houston, Texas 77006
Phone: (888) 350-3931
Service only: service@eksm.com

**ATTORNEYS FOR PLAINTIFF AND THE PUTATIVE CLASS**
(* denotes *pro hac vice* forthcoming)